IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2018

## FREDDIE ARMSTRONG v. SHELBY COUNTY JUVENILE COURT,
### ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH-17-0371      Jim Kyle, Chancellor**

_____

### No. W2018-00169-COA-R3-CV

_____

This appeal involves the termination of a county employee for insubordination and intentional failure to carry out instructions. The employee appealed to the Shelby County Civil Service Merit Board, which upheld his termination after a hearing. The employee then sought review in chancery court, and again his termination was upheld. He now seeks review before this Court. For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which Charles D. Susano, Jr., and RICHARD H. DINKINS, JJ., joined.

Laura Elizabeth Smittick and Darrell James O'Neal, Memphis, Tennessee, for the appellant, Freddie Armstrong.

Emmett Lee Whitwell, Memphis, Tennessee, for the appellees, Shelby County Juvenile Court, and Shelby County Civil Service Board.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

Freddie Armstrong was employed as a process server for the Shelby County Juvenile Court Clerk's Office. Process servers are not provided with county vehicles and must instead use their own personal vehicles to travel their routes. In return, the county pays a mileage reimbursement to the process servers. It is standard practice for

supervisors within the processing department to ride along with process servers on occasion in order to observe their performance, especially when a process server has a decrease in his or her productivity level.

On September 22, 2016, Lieutenant Stanley McNeil, a supervisor within the processing department, informed Armstrong that he would be riding along with him to observe his performance that day. According to Lieutenant McNeil, Armstrong's service completion numbers had recently declined, and he was directed to observe Armstrong by one of his own supervisors. When Lieutenant McNeil conveyed this information to Armstrong, he replied, "I'm not going to allow you to do that. . . . That's my personal vehicle, and that's my car. I'm not going to allow you to ride in it. Show me in the contract where it's allowed that you should ride with me." After discussing the incident with his supervisor, Lieutenant McNeil told Armstrong to clock out for the day. Armstrong refused to clock out until he spoke with another supervisor but did ultimately leave. After a disciplinary hearing before a hearing panel, Armstrong was suspended without pay for ten days for insubordination and intentional failure to carry out instructions. The letter notifying him of the suspension concluded by stating, "Upon your return, you will be expected to comply with the policies of Shelby County and the Clerk's office. Failure to comply may lead to termination." Armstrong filed an administrative grievance, but his discipline was sustained after the administrator found no justification for Armstrong's refusal to allow the ride along session.

When Armstrong returned to work after his ten-day suspension, Lieutenant McNeil informed him, again, that he had been instructed to ride along with Armstrong to observe his performance. Armstrong said that he objected but that he would allow it "under protest" because he could not afford to miss any more work without pay. However, Armstrong said that he needed to be provided with "written feedback" after the ride along session. When Lieutenant McNeil said that he would only be providing oral feedback, Armstrong said, "No, Lt. McNeil, I need a written evaluation, because if you give me oral feedback, then you can tell me one thing; you can go tell [your supervisor] something else, you can tell [another supervisor] something else. . . . I need a written report stating the results[.]" The ride along session was completed, but Lieutenant McNeil did not provide Armstrong with oral or written feedback. That same day, Armstrong sent an email to Lieutenant McNeil, two other superior officers, and the Juvenile Court Clerk, requesting a "written report with my evaluation results" and information regarding eleven topics, including the factual reason the evaluation was required, the purpose of the evaluation, the guidelines used to evaluate him, and other matters. However, Armstrong was never given the written report he demanded.

Two weeks later, on November 2, 2016, Lieutenant McNeil informed Armstrong that he would be riding along with him again. Armstrong replied, "This is harassment. Why are you riding with me?" Lieutenant McNeil explained that he was riding along with Armstrong because his serve rate had been low for the past couple of months.

According to Lieutenant McNeil, he sat inside the building waiting for Armstrong to get ready to leave for at least ten minutes and waited several more minutes outside by Armstrong's vehicle. When Armstrong finally came outside, he stood there by the vehicle texting or emailing someone on his cell phone. Lieutenant McNeil told Armstrong several times that it was getting late in the day and that they needed to get going. Armstrong angrily said, "How are you going to tell me how to run my route? This is my car." Armstrong unlocked the vehicle but told McNeil that he would have to sit in the back seat so that he could keep his paperwork spread out in the front seat. Armstrong got in the vehicle but continued to work on his email. When Lieutenant McNeil again suggested that they needed to get going, Armstrong asked Lieutenant McNeil why he was not riding with two other process servers whose numbers had declined. After more time passed with the two men sitting in the stationary vehicle and Armstrong still working on his email, Lieutenant McNeil said that he was leaving and exited the vehicle.

After this incident, Armstrong had another disciplinary hearing before the hearing panel, and this time, the panel decided that termination was warranted due to Armstrong's insubordination and intentional failure to carry out instructions. His termination letter explained:

> As you are fully aware, this latest exhibition of your disrespect and insubordination to members of your management team comes after repeated efforts of the senior management staff to help you reverse your unacceptable conduct and failures to follow simple straight forward instructions.
> Your attitude of disrespect is visible to those around you, which impacts the morale of those of your colleagues who try to always follow instructions with a respectful attitude for the benefit of the entire team that you are supposed to be a part of.
> Your prior exhibitions of failing and refusing to follow the instructions of your manager coupled with your visibly disrespectful conduct justified an earlier termination for each of the infractions for which you were given less discipline, in hopes that you would reform your conduct.
> In light of your progressively insubordinate conduct and refusal to understand the requirement that subordinates are to follow the job related instructions given to them by those appointed as their manager; and your latest insubordination which, on its own justifies your termination, it is my determination that you be terminated from your employment as a process server for the Shelby County Juvenile Court Clerk's Office effective November 15, 2016.

Armstrong appealed his termination to the Shelby County Civil Service Merit Board.

The Board held a hearing on January 10, 2017, and heard testimony from Armstrong, Lieutenant McNeil, the chief administrative officer of the Juvenile Court Clerk's Office, and the Juvenile Court Clerk. Armstrong presented what appears to be a self-prepared document listing his service rates by month. The document reflects that his service rates did in fact decline in the month before the first attempted ride along session in September 2016. From February to July of 2016, Armstrong's monthly service rates exceeded 100 documents each and every month. In August, his rate declined to 67. Still, Armstrong insisted that his service rates had not declined for any extended period and therefore a ride along session was unwarranted. Armstrong testified that he also objected to the ride because he personally felt that the county could not put another county employee in his vehicle to perform work duties. He said he was also concerned about issues such as insurance liability and possible damage to his vehicle by an additional passenger. Armstrong testified that no one ever responded to his requests for a written policy that would allow the county to put other employees in his vehicle, and no one considered his request to be provided with a county vehicle or supervisor's vehicle for the ride along session.

Armstrong acknowledged that during the most recent attempted ride along session on November 2, 2016, he sat in his vehicle attempting to compose an email to the EEOC and that Lieutenant McNeil "kept trying to rush me to get started on my route." Armstrong said,

> [Lieutenant McNeil] advised me several times, "We need to get started." And a couple times he gave me a directive, "Armstrong, we need to get started now."

Armstrong said his concern was that throughout his four-year work history, he had never had a supervisor tell him when to begin a route. Armstrong testified that at that point he looked at Lieutenant McNeil in the back seat and observed that Lieutenant McNeil did not have his seat belt fastened. According to Armstrong, he told Lieutenant McNeil that "[m]y car will not move until you put your seat belt on," but Lieutenant McNeil refused to buckle his seatbelt. According to Armstrong, Lieutenant McNeil then told him to go clock out and exited the vehicle. Armstrong disagreed with the suggestion that he had acted in an angry or belligerent manner during his disciplinary hearings, stating, "Basically, I'm straightforward. I'm not going to hold any punches, whatever, but if I feel like, you know, you're doing me wrong, I'm going to state it. I'm not going to try to sugar-coat it or anything like that."

Armstrong acknowledged that he had also been disciplined on another occasion in 2014 for intentional failure to carry out instructions when he refused to watch an ethics training video. Armstrong explained that he had already watched the video at home but did not print out the certificate to verify that he viewed it, and when a supervisor instructed him to watch it again due to the lack of documentation, he refused.

Lieutenant McNeil testified that he was instructed to ride along with Armstrong because his service rates were down but that he had supervisory authority to ride along with any of the process servers even if he did not perceive an issue with their performance. Lieutenant McNeil testified that on the morning of the final attempted ride along session, he repeatedly told Armstrong that it was getting late and they needed to get going, but Armstrong took more time than normal preparing to leave and writing emails and addressed him angrily in response to his instructions. Lieutenant McNeil said Armstrong continued emailing "as if what I said didn't even matter to him." He said he told Armstrong as he exited the vehicle, "I asked you repeatedly, three times or more, to let's get going with your route, but you refuse to listen to me." Lieutenant McNeil also testified that he had fastened his seat belt when he entered the car and taken it off before he exited.

Harvey Henderson, the chief administrative officer for the Juvenile Court Clerk's Office, testified that he was responsible for the day to day operations of the office and overseeing disciplinary actions. He testified that ride along sessions are "not unusual at all" and are conducted for many different reasons, from retraining to informational purposes simply to find out what is happening in the field. He testified that insubordination was considered a major violation and that the county could have terminated Armstrong's employment on the first offense, but instead the county gave him multiple chances. Henderson recalled each of Armstrong's three disciplinary issues and said the common denominator among all three was that "Mr. Armstrong seems to want to do what he wants to do when he wants to do it the way he wants to do it, irregardless of what's requested of him by his supervisors." He added, "[i]nsubordination is the exact term I would use" to describe Armstrong's conduct. Henderson testified that Armstrong was even combative and argumentative during his disciplinary hearings.

The Juvenile Court Clerk, Joy Touliatos, testified as well. She described having a fairly small office environment in which everyone knows what is going on with other employees. She testified that when one employee refuses to do his or her job or take orders from a supervisor, it is known throughout the office and sends the message that employees do not have to follow orders. Ms. Touliatos testified that keeping Armstrong in the office any longer would have absolutely caused more problems because he did not follow orders.

The Board entered a written order finding that Armstrong violated the cited policies and was terminated for just cause. Armstrong then filed a petition seeking review in the Chancery Court of Shelby County. After reviewing the administrative record, the chancery court entered an order affirming the decision of the Board. Armstrong timely filed a notice of appeal to this Court seeking further review of the Board's decision.

## II.    ISSUES PRESENTED

On appeal, Armstrong argues that the chancery court erred when it found substantial and material evidence to support the decision of the Board.  For the following reasons, we affirm the decision of the chancery court.

## III.    STANDARD OF REVIEW

"Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322."    Tenn. Code Ann. § 27-9-114(b)(1).    Accordingly, Tennessee Code Annotated section 4-5-322(h) contains the standard of review applicable to the Board's decision:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
>> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).  On appeal, we review the decision of the Shelby County Civil Service Merit Board using the same standard of review used by the chancery court. *Parker v. Shelby County Gov't Civil Serv. Merit Bd.*, 392 S.W.3d 603, 611 (Tenn. Ct. App. 2012); *Macon v. Shelby Cty. Gov't Civil Serv. Merit Bd.*, 309 S.W.3d 504, 508 (Tenn. Ct. App. 2009).  In reviewing the record for substantial and material evidence, "'[t]he evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.'"  *Parker*, 392 S.W.3d at 612 (quoting *Jackson Mobilphone Co., Inc. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993)).

## IV.    DISCUSSION

On appeal, Armstrong argues that the Board's decision is not supported by substantial and material evidence because the county did not produce any written policy or contract stating that a county employee must allow supervisors to ride in his or her personally owned vehicle. However, this argument misses the point. Armstrong was not disciplined for violating any county policy regarding ride along sessions. He was disciplined for insubordination and intentionally failing to follow instructions. The Civil Service Merit Board found that Armstrong "exhibited disrespect towards management and would not follow directives of management." Pursuant to Shelby County's "Employee Discipline Policy and Procedures," county employees may be "removed, demoted, reduced in pay, suspended without pay, or placed on probation for just cause[,]" and some examples of just cause include "Acts of insubordination" and "Willful disregard of lawful orders." A reasonable person could certainly conclude that Armstrong's continued refusal to cooperate with or obey the directives of Lieutenant McNeil in connection with the final ride along session was insubordination and exhibited a willful failure to follow lawful instructions. In fact, we agree with the observation by Henderson that insubordination is the exact term that comes to mind to describe Armstrong's defiant conduct. *Black's Law Dictionary* defines "insubordination" as:

> 1. A willful disregard of an employer's instructions, esp. behavior that gives the employer cause to terminate a worker's employment. 2. An act of disobedience to proper authority; esp., a refusal to obey an order that a superior officer is authorized to give.

*Black's Law Dictionary* (10th ed. 2014). We are not aware of any authority for Armstrong's suggestion that a specific written policy must have also existed mirroring the verbal instruction that he disobeyed while being insubordinate. Armstrong could not simply ignore instructions given by his supervisor simply because they were not also contained within some written policy.

Next, Armstrong insists that he did not refuse the final ride along and allowed Lieutenant McNeil to get in his car. However, the evidence clearly demonstrates that Armstrong angrily responded to his superior and repeatedly refused to begin driving despite numerous clear directives from Lieutenant McNeil. At the hearing before the Board, Armstrong attempted to blame Lieutenant McNeil for not having his seat belt fastened, but Lieutenant McNeil testified that he had put on his seatbelt when he entered the vehicle. After considering the testimony, the Board found that Lieutenant McNeil "attempted" to conduct the ride along and that Armstrong "constantly questioned why Mr. McNeil was riding with him and purposely delayed the ride along." Ample evidence supports the Board's conclusion and its implicit rejection of Armstrong's theory that his refusal to drive was simply because of an unfastened seat belt.

Next, Armstrong argues that the Board should not have considered his 2014 discipline for intentional failure to carry out instructions because county policies provide

that discipline in the form of counseling may be removed from an employee's personnel file after one year. Thus, he claims that the 2014 discipline was "void." To the contrary, however, the county policy actually states that disciplinary action in the form of discussion and counseling "*may* be removed from an employee's Master Personnel file" after a minimum of one year with no other disciplinary action "[a]t the written request of [the] employee's department head and on the approval of the Administrator of Personnel." (emphasis added). It does not provide that removal is mandatory or automatic or that discipline that is not removed is void. In any event, Armstrong did not object to the Board considering the 2014 discipline and even testified about his version of the events during the hearing before the Board. Under these circumstances, we cannot say that the Board erred in considering such evidence.

On appeal, Armstrong also cites caselaw regarding Fourth Amendment guarantees and his expectation of privacy. However, these arguments were not raised in the trial court and cannot be raised for the first time on appeal to this Court. *See Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 670 (Tenn. 2013) ("Issues raised for the first time on appeal are waived.").

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Freddie Armstrong, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE